IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

OLD DOMINION ELECTRIC COOPERATIVE,

Plaintiff,

v.

RAGNAR BENSON, INC.,

Defendant.

Civil Action Number 3:05CV034-JRS

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Plaintiff and Counter-Defendant Old Dominion Electric Cooperative's ("ODEC") first Motion for Partial Summary Judgment on Counterclaims II, VI, VII, VIII, X, and XI asserted by Defendant and Counter-Plaintiff Ragnar Benson, Inc. ("RBI"). For the reasons explained herein, ODEC's first Motion for Partial Summary Judgment (**Docket Entry # 22**) is GRANTED.

## I.    BACKGROUND

### A.    General Background

In late 2002, ODEC, a Virginia utility cooperative, contracted with RBI, an Illinois corporation, to construct the Marsh Run electrical generation plant (the "Project") in Remington, Virginia.[1] On December 16, 2002, the parties signed the Engineer, Procure and Construct Contract (the "Contract" or "Agreement") that is the subject of this litigation. Pursuant to the contractual

---

[1] The contracting parties were RBI and Marsh Run Generation, LLC. Effective April 30, 2003, March Run Generation, LLC dissolved and assigned all of its rights and obligations under the Contract to ODEC.

terms, ODEC agreed to pay RBI approximately $47 million for its services.[2]  The parties agreed to

a start construction date of April 1, 2003.  Construction did not actually commence until June 16,

2003, however, due to delays in obtaining zoning exceptions and a land developer's agreement,

which delayed the permit process.  The Project included the construction of three combustion turbine

units and common facilities to support the operation of up to four additional combustion units.  The

parties agreed to a Scheduled Substantial Completion Date (the "Substantial Completion date") of

May 1, 2004.  Upon RBI's request for an extension of time in November 2003, ODEC extended the

Substantial Completion date by several days.  With its progress hindered by a myriad of factors, the

Project continued to languish in the coming months.  On December 23, 2004, ODEC terminated the

Contract, alleging RBI's default.

        ODEC originally filed suit against RBI in the Circuit Court for the County of Henrico,

Virginia.  On January 18, 2005, RBI removed the case to this Court.  ODEC's Motion for Judgment

contains two counts: one for liquidated damages against RBI and the other for breach of contract as

a result of the occurrence of an event of default as defined in the Contract.  In its Answer, RBI raised

nineteen separate defenses and fourteen counterclaims.  In response, ODEC raised twelve defenses

to RBI's counterclaims.   The instant Motion relates mainly to the issue of which party was

responsible for the cost of excavating rock from the Marsh Run project site.  Significantly, ODEC

provided each prospective bidder on the Project with a copy of the Geotechnical Engineering Study

prepared by Schnabel Engineering Associates, Inc. (the "Schnabel Report" or "Report").   The

Schnabel Report and the associated Contract sections are at the heart of RBI's counterclaims and

_____

[2] Pursuant to the Contract, the payment amount could be adjusted only by a Change Order.

ODEC's instant Motion for Partial Summary Judgment.  The counterclaims that are the subject of this Motion are as follows:

**Counterclaim II**:    Breach of Contract – Rock Excavation

**Counterclaim VI**:    Breach of the Implied Duty of Good Faith and Fair Dealing

**Counterclaim VII**:    Fraud

**Counterclaim VIII**:    Fraud – Nondisclosure

**Counterclaim X**:    Fraud – Lost Business Opportunities

**Counterclaim XI**:    Estoppel/Detrimental Reliance

**B.**    **Facts Relevant to Counterclaims at Issue**

Section 4.2 of the Contract deals with site acceptance and provides:

> Contractor [RBI] acknowledges that (i) it has been furnished with a preliminary geotechnical study and site survey drawings with respect to the Site, (ii) that after careful examination, Contractor has satisfied itself as to the nature and location of the Site, the suitability of the Site for performance by Contractor of the Work, the character of equipment and facilities needed before and during construction of the Facility, the general and local conditions and all other matters relating to the Site which may in any way affect the performance of Contractor under this Agreement, and (iii) Contractor has found the same to be acceptable and satisfactory.  Contractor shall promptly notify Owner [ODEC] upon discovery of (i) any previously unknown physical conditions (including without limitation, unknown subsurface conditions) at the Site of an unusual nature, not revealed by previous investigations and differing from those ordinarily encountered in work of the character provided for in this Agreement and (ii) the presence of any Hazardous Materials of archeological remains.  Contractor expressly assumes any and all risks associated with subsurface conditions, both usual and unusual, known and unknown, at or near the Site except as set forth herein. *Contractor shall not be entitled to an adjustment in the Contract Price and/or the Scheduled Substantial Completion Date due to any subsurface condition, <u>except for</u> (i) subsurface conditions which differ from those identified in the preliminary geotechnical study and site survey and*

3

> *which have been identified by Contractor prior to contract award .*
> *. . . If the presence of (i) subsurface conditions which differ from*
> *those identified in the preliminary geotechnical study and site survey*
> ***and which have been identified by Contractor prior to contract***
> ***award*** *. . .* shall cause a demonstrable and material increase in
> Contractor's costs of, or the time required for, performance of any
> part of the Work, Contractor shall be entitled to an equitable
> adjustment in the Contract Price and/or an extension in the Scheduled
> Substantial Completion Date pursuant to a Change Order processed
> pursuant to Section 8 hereof.

EPC Contract § 4.2 (emphasis added).  The geotechnical study referred to in the first sentence is the

Schnabel Report.  The Schnabel Report contains a detailed analysis of the Project site and the

techniques used to analyze the subsurface stratigraphy.  Among its many attributes, the Report makes

recommendations regarding rock excavation and offers a definition for rock excavation.  In its

responses to ODEC's first set of interrogatories, RBI did not identify any subsurface conditions that

differed from those identified in the Schnabel Report and site survey prior to being awarded the

Contract.

With regard to rock excavation, the Schnabel Report describes "[d]isintegrated rock and rock

. . . in all of the borings at depths of about 0.9 to 5 ft with an average depth of about 3 ft below the

ground surface."  Schnabel Report § 3.2.3.  The Report anticipated that "excavation of these

materials [would] be needed" and that most of the disintegrated rock could be ripped with suitable

equipment.  Id.  The Report also states, however, that "[r]ock excavation techniques may be required

to excavate these materials for deeper excavations and utility excavations."  Id.  The Report indicates

that, at an average depth of three feet, all 24 of the borings revealed nearly impenetrable rock.  Id.;

id. App. A.  Finally, Section 3.2.3 explains that "[a] rippability test could be performed prior to

bidding to confirm the excavation characteristics of the materials present on this site."  Nowhere in

the Schnabel Report or in the Contract is there a definition of "rock," "disintegrated rock," "rippable rock," or "rock excavation techniques."

Apart from Section 4.2, one of the Contract appendices contains a provision for tracking costs for rock excavation.  Section 11.5.1 of Appendix I states:

> Contractor [RBI] shall perform all necessary clearing, grubbing, excavation, filling, and backfilling, including dewatering and shoring as required for foundations, support structures, underground utilities, drainage, and final grading as required.  This shall include rock excavation of any materials found during this work that can be removed by a standard size backhoe with a standard bucket with teeth.  If materials are found that cannot be removed by this equipment or the equipment normally used for the work, the Owner [ODEC] is to be advised and provided with recommendations and costs for its ultimate removal.

EPC Contract App.  I, § 11.5.1.  It should also be noted, though, that an order of preference clause contained in the Contract explains: "If there is any inconsistency between any of the documents forming this Agreement, including the terms and conditions hereof and the Appendices attached hereto, their order of precedence shall be as follows: (i) This Agreement; (ii) Appendix I; and (iii) All other Appendices attached hereto."  EPC Contract § 1.

Finally, Section 3.3, dealing with the scope of work in general, provides:

> On a fixed price, lump sum "EPC" basis, Contractor shall design, engineer, procure, construct, start-up, test and provide personnel training for the operation and maintenance of a power production facility of the type meeting the requirements and specifications set forth in the EPC Specifications attached as <u>Appendix I</u>, including without limitation, construction of and installation of the Owner-Furnished Equipment (collectively, the "*Facility*") in conformance with the terms and conditions of this Agreement and all Applicable Laws.  The Facility will be built on the site more particularly described in <u>Appendix II</u> hereto (the "*Site*").  *The scope of Contractor's responsibilities hereunder is set forth more particularly in the Appendices hereto* and includes, without limitation, furnishing

all services, supervision, labor, materials, supplies, equipment and machinery . . . required to complete . . . the Facility. The responsibilities of Contractor hereunder are sometimes called the "*Work*" (such term also means that which is produced, constructed or built pursuant to this Agreement, where the context so requires). Where this Agreement describes the Work in general terms, but not in complete detail, it is understood and agreed that the Work includes any incidental work required to complete the Facility. Any unique drawing or engineering necessary shall constitute part of the Work to be performed by Contractor.

Id. § 3.3 (second emphasis added).

## II.   PARTIES' REPRESENTATIONS AS TO MATERIAL FACTS

Both parties' statements of material facts often inject legal arguments into purportedly factual accounts. Nevertheless, despite the prevalence of legal conclusions masquerading as factual representations, the Court will briefly summarize the parties' "statements of material facts."

### A.   ODEC's Representations as to Undisputed Facts

ODEC claims that the Schnabel Report put RBI and the other Project bidders on notice of the likelihood that the Project site contained non-rippable rock. ODEC relies on a statement made by RBI to one of its subcontractors, Sauer, Inc.—"Sauer was provided the soils report at the time that we solicited your sub bid for this project. The presence of substantial amounts of rock was always known to the sub bidders."—as an indication that RBI knew about the subsurface conditions. Letter from David Berthelsen to Geoffrey Murken (Jan. 27, 2004) (attached to Pl.'s Mem. Supp. Mot. Partial Summ. J. as ex. 4(K)).

According to ODEC, the other four bidders on the Project—Burns & McDonnell, Black & Veatch, Kamtech, and Fru-Con—recognized the potential for non-rippable rock at the Project site and refused to accept the complete risk for subsurface conditions proposed by Section 4.2 of the

Contract.  Two of the five bidders proposed changes to the Contract that would shift the risk of subsurface conditions to ODEC.  Two others refused to accept the full risk of encountering non-rippable rock.  RBI did not propose changes to the Contract regarding the subsurface conditions and did not seek exceptions to the risk allocation presented in the Contract.  Consequently, by failing to identify any subsurface conditions that differed from those identified in the Schnabel Report prior to the Contract award, ODEC asserts that RBI accepted the subsurface risk for the Project.

**B.    RBI's Representations as to Disputed and Undisputed Facts**

RBI explains that Section 4.2 of the Contract specifically references exceptions to that section's general applicability and that Section 11.5.1 provides such an exception.  RBI contends that Section 11.5.1 indicates that non-rippable rock is outside of the Contractor's scope of work.  RBI asserts that its only obligation as to non-rippable rock was to advise ODEC of its discovery and provide ODEC with its recommendation for removing the rock.  RBI claims that Section 11.5.1 gave ODEC the option to have the Contractor perform the work or to engage a third party.

RBI raises some question regarding ODEC's purpose or motivation in hiring Schnabel to prepare the geotechnical survey.  RBI declares that ODEC did not provide Schnabel with many key reports regarding the Project site, and, as a result, Schnabel produced a false and/or misleading geotechnical report.  According to RBI, ODEC produced the Schnabel Report to the bidders knowing that it did not accurately depict the site conditions.  RBI points to five separate reports and letters that RBI claims indicated the high probability of igneous rock on the site.  RBI cites a December 1996 letter from the Geologic Supervisor of the Commonwealth of Virginia, a 1997 Site Feasibility Assessment, an October 1997 Siting Study Report, a 1999 report prepared by Dr. Martin Chapman, and a March 2001 Fauquier County Planning Commission Staff Report.

7

RBI claims that the Schnabel Report failed to incorporate relevant information from a report prepared by Burns & McDonnell.  RBI asserts that the Schnabel Report does not identify or include the compressive strength test results for specific borings, nor does it include the report of Dr. Martin Chapman that is referenced in the Burns & McDonnell report.  Dr. Chapman's report discusses the presence of igneous rock on the Project site and attaches a map showing that the Project site is encompassed by an area containing igneous intrusions.  RBI contends that the omitted sections of the Burns & McDonnell report would have provided the bidders with a clear understanding of the actual subsurface conditions on the Project site.

RBI insists that it did not accept all of the risk for subsurface conditions on the Project site. RBI argues that Section 4.2 did not obligate it to identify non-rippable rock prior to the Contract award.  Instead, RBI states that Section 3.3 of the Contract provides that the scope of the Contractor's duties are set forth in Appendix I, and that Section 11.5.1 of Appendix I specifies that the removal of non-rippable rock was not within RBI's scope of work.  RBI claims that on July 22, 2003, RBI encountered non-rippable rock and immediately notified ODEC that it was attempting to assess the work and prepare a recommendation for ODEC concerning the costs for ultimately removing the rock.  On July 24, 2003, RBI provided ODEC with a proposed course of action for removing the rock, including an outline of costs.  RBI believes that ODEC advised RBI to proceed as outlined.

RBI began work to remove the non-rippable rock in the days that followed July 24, 2003. On August 7, 2003, RBI wrote to ODEC to advise of the need to blast the non-rippable rock.  Once again, RBI states that ODEC gave its approval.  Following that response, RBI continued to perform the necessary rock removal.  RBI submitted testimony from James Debiec of ODEC that as early as

8

July 2003, ODEC knew that RBI expected to receive additional compensation for removing non-rippable rock and that by August 2003, ODEC concluded that it did not owe RBI for the additional rock excavation work.  On September 11, 2003, RBI advised ODEC of the actual costs incurred up to that date and the estimated total cost of completing the removal.  On September 30, 2003, ODEC informed RBI that ODEC would not be able to properly evaluate and determine the validity of RBI's claim until RBI could fully document the costs and delays attributed to the non-rippable rock excavation.  On November 20, 2003, ODEC denied RBI's request for additional money and an extension of the Substantial Completion date based on Section 4.2 of the Contract.

## III.   SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Smith v. Continental Casualty Co., 369 F.3d 412, 417 (4th Cir. 2004).  By its very definition, the summary judgment standard provides "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  At this stage, the Court will only concern itself with disputes over facts "that might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248.  Moreover, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Id.  The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved

9

in favor of either party." Id. at 250.  Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

In accordance with the Erie Doctrine, a federal court resolving a diversity action applies the choice of law rules of the forum state—in this case, Virginia—to determine which state's substantive laws to apply to the merits of the case.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). Virginia adheres to traditional choice-of-law rules whereby "the nature, validity and interpretation of contracts are governed by the law of the place where made, unless the contrary appears to be the express intention of the parties." Woodson v. Celina Mutual Ins. Co., 211 Va. 423, 426, 177 S.E.2d 610, 613 (1970) (quoting C.I.T. Corp. v. Guy, 170 Va. 16, 22, 195 S.E. 659, 661 (1938)).  In the instant case, Section 15.12 of the Contract specifically states that Virginia law shall govern the "validity, interpretation, construction, and performance of this Agreement without regard to principles of conflicts of law." EPC Contract § 15.12.

## IV.   DISCUSSION

### A.   Counterclaim II: Breach of Contract – Rock Excavation

In Counterclaim II, RBI alleges that ODEC breached the Contract by failing to inform RBI "fully and properly of the likely existence and extent of subsurface, non-rippable rock at the Project site and/or by wrongfully refusing as failing to grant RBI an extension of the Substantial Completion date and refusing to pay RBI for the costs associated with the removal of the non-rippable rock." RBI Answer and Counterclaims ¶ 155.  According to ODEC, the inclusion of Section 11.5.1 in Appendix I does not undermine the precondition requirements placed on the Contractor in Section 4.2 of the Contract.  ODEC claims that Section 11.5.1 does not obligate ODEC to pay additional compensation for rock excavation where RBI had not first satisfied the requirements of Section 4.2.

10

That is, RBI would be entitled to additional compensation under Section 11.5.1 if RBI had encountered subsurface conditions that were not identified in the Contract, provided that RBI had identified them prior to being awarded the Contract.

RBI argues that its obligations with regard to subsurface rock conditions are outlined, in part, in Section 11.5.1, and that Section 3.3, rather than Section 4.2, of the Contract dictates RBI's responsibilities. RBI claims that Section 3.3, when read in conjunction with Section 11.5.1, limits its duty with regard to rock removal. RBI insists that it had no additional obligations with regard to non-rippable rock other than to bring the conditions to ODEC's attention and provide a cost estimate for removal. RBI maintains that ODEC bears the ultimate responsibility for the cost of removal.

The Supreme Court of Virginia has long embraced the principle that courts "must give effect to the intention of the parties *as expressed in the language of their contract*, and the rights of the parties must be determined accordingly." Foti v. Cook, 220 Va. 800, 805, 263 S.E.2d 430, 433 (1980) (emphasis added). When faced with seemingly inconsistent terms, a court should try to "give effect to all [of a contract's] provisions and to render them consistent with each other." Silicon Image, Inc. v. Genesis Microchip, Inc., 271 F. Supp. 2d 840, 855 (E.D. Va. 2003) (quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995)).

In this Court's assessment, the most logical reading of the Contract sections at issue is that Section 4.2 requires a bidder to identify subsurface conditions not otherwise present in the Schnabel Report in order to receive additional compensation if those conditions cause increased expense or delay the work on the Project. Section 11.5.1 of the technical specifications in Appendix I states, generally, that the Contractor's work "shall include rock excavation of any materials found during this work that can be removed by a standard size backhoe with a standard bucket with teeth." EPC

Contract App. I, § 11.5.1. Section 11.5.1 also provides, however, that RBI was to notify ODEC of rock that could not be readily removed with a standard backhoe and provide recommendations and costs for its removal.

It is the Court's position that Section 4.2 of the Contract and Section 11.5.1 of the technical specifications in Appendix I are consistent. Section 4.2 bears on which party must pay for the costs of rock excavation, while Section 11.5.1 specifies the manner in which the rock will be removed and instructs the Contractor to advise the site owner if materials are found that cannot be removed by a standard backhoe with a standard bucket with teeth. If the Schnabel Report had predicted non-rippable rock in the area where it was ultimately encountered, then RBI would not have been entitled to additional compensation for its removal; RBI would have assumed the responsibility for those subsurface conditions. Conversely, if the conditions were not identified in the Schnabel Report and RBI had identified such conditions prior to being awarded the Contract, then RBI would have been entitled to additional compensation, subject to Section 11.5.1's requirement that it first make recommendations to ODEC for removing the non-rippable rock.

Even if the Court were to view Sections 4.2 and 11.5.1 as inconsistent, it is the Court's duty to "construe [the terms] according to their plain meaning." Bridgestone/Firestone, Inc. v. Prince William Square Assocs., 250 Va. 402, 407, 563 S.E.2d 661, 664 (1995). Section 1 of the Contract clearly explains that the terms of the Contract itself must be given precedence over the terms detailed in the appendices. As such, any conflict must be resolved in favor of applying the language of Section 4.2 of the Contract over any language in Section 11.5.1 of the technical specifications in Appendix I.

Finally, as to RBI's contention that Section 3.3 of the Contract dictates and limits the scope

of RBI's responsibilities, it is clear that the Contractor must complete all tasks not expressly reserved

to the Owner or other parties.  Section 3.3 states, in relevant part:

> Contractor shall . . . construct . . . a power production facility of the type meeting the requirements and specifications set forth in the EPC Specifications attached as <u>Appendix I</u> . . . . The scope of Contractor's responsibilities hereunder is set forth more particularly in the Appendices hereto and *includes, without limitation, furnishing all services, supervision, labor, materials, supplies, equipment and machinery . . . required to complete . . . the Facility*. . . . Where this Agreement describes the Work in general terms, but not in complete detail, it is understood and agreed that the Work includes any incidental work required to complete the Facility.

EPC Contract § 3.3 (emphasis added).  Despite the language in Section 3.3 indicating that the

Contractor must construct a facility "meeting the requirements and specifications set forth in . . .

<u>Appendix I</u>," RBI cannot successfully argue that its scope of work was limited to and defined solely

by the specifications listed in Appendix I.  Significantly, other sections of the Contract suggest that

RBI undertook a turnkey project with performance-based specifications.  <u>See, e.g.</u>, <u>id.</u> § 1.2 ("[The

Appendices] are not meant as detailed design specifications, but to . . . define the *minimum* project

scope . . . .") (emphasis added).

As the Court sees it, for RBI to have any reasonable standing to argue that ODEC breached

the Contract by refusing to grant RBI an extension of the Substantial Completion date or pay RBI

for the costs associated with the removal of the non-rippable rock, RBI would have needed to notify

ODEC, prior to being awarded the Contract, of any subsurface conditions differing from those

identified in the Schnabel Report.  Of particular consequence, RBI did not do so.  Accordingly, ODEC's Motion for Partial Summary Judgment will be granted as to Counterclaim II.[3]

**B.   Counterclaims VII, VIII, and X: Fraud, Fraud – Nondisclosure, and Fraud – Lost Business Opportunities**

Counterclaims VII, VIII, and X each allege that ODEC engaged in some form of fraudulent conduct.  RBI's overarching grievance for its fraud-based counterclaims is that ODEC failed to disclose material information to RBI concerning the presence of non-rippable rock at Marsh Run. RBI refers specifically to the Schnabel Report and labels it false, misleading, and incomplete.

To prevail on a claim of actual fraud in Virginia, the complaining party must prove the following elements: 1) a false representation, 2) of a material fact, 3) made intentionally and knowingly, 4) with intent to mislead, 5) reliance by the party misled, and 6) resulting damage to the party mislead.  See, e.g., Davis v. Marshall Homes, Inc., 265 Va. 159, 166, 576 S.E.2d 504, 506 (2003) (citations omitted).  Notably, the reliance must be objectively reasonable.  See Evaluation Research Corp. v. Alequin, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994).  To prove constructive fraud, the elements are the same, except that the misrepresentation of material fact need only be made "innocently or negligently."  Id.  The elements of proof for establishing fraudulent conduct are not merely persuasive factors for a court to consider.  Rather, the complaining party bears the burden of establishing each and every element by clear and convincing evidence.  See id.

RBI has not and cannot establish that the Schnabel Report constituted a false representation or that RBI reasonably relied on it in preparing its bid for the Project.  Although the Report did not

---

[3] For the sake of efficiency, and in light of the substantial overlap of RBI's arguments, the next Section of this Opinion will discuss RBI's claim that ODEC failed to fully and properly disclose the likely existence and extent of subsurface, non-rippable rock at Marsh Run.

14

prove to be entirely accurate, RBI has not presented any evidence indicating that ODEC intentionally or knowingly misrepresented a material fact.   Indeed, the Report made clear that rock excavation techniques would likely be necessary and even invited potential bidders to conduct rippability tests to ascertain the true nature of the subsurface conditions.   The Report revealed that, at the relatively shallow average depth of three feet in all of the borings, heavy drilling could barely make a dent in the subsurface rock.   In short, if RBI subjectively believed that the Schnabel Report stood for the proposition that all subsurface rock could be removed using a standard size backhoe with a standard bucket with teeth, such reliance was not objectively reasonable.   RBI's inclination during the bidding stage to turn a blind eye toward the likely presence of non-rippable rock below the surface at Marsh Run precludes a cognizable claim of either actual or constructive fraud.   As such, summary judgment will be granted as to Counterclaims VII, VIII, and X.

## C.   Counterclaim VI: Breach of the Implied Duty of Good Faith and Fair Dealing

In Counterclaim VI, RBI alleges that ODEC owed it an implied duty of good faith and fair dealing with respect to all matters pertaining to the Contract and that ODEC breached that duty by refusing to extend the Substantial Completion date.   RBI claims that it was entitled to an extension of that deadline, as well as compensation for the additional expense of removing the non-rippable rock, pursuant to Section 11.5.1 of the Contract specifications.

RBI draws the Court's attention to the concept that "a party may not exercise contractual discretion in bad faith, even when such discretion is vested solely in that party."   Virginia Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d 535, 542 (4th Cir. 1998).   Similarly, as the United States Court of Appeals for the District of Columbia held when interpreting Virginia law, "an implied duty of good faith and fair dealing may place some limitations upon the otherwise unfettered

15

discretion of one party to a contract to determine the extent of the other party's contractual obligations." Riggs Nat'l Bank of Washington, D.C. v. Linch, 36 F.3d 370, 373 (4th Cir. 1994) (quoting Tymshare, Inc. v. Covell, 727 F.2d 1145, 1154 (D.C. Cir. 1984)).  RBI has not shown that ODEC used its discretion in bad faith.  Moreover, ODEC's discretion was "expressly 'fettered'" by the provision in Section 4.2 of the Contract entitling RBI to an adjustment of the Contract price and the Substantial Completion date for the removal of non-rippable rock differing from the subsurface conditions identified in the Schnabel Report, provided that RBI duly notified ODEC prior to being awarded the Contract.  Id.

As the Riggs court noted, the implied duty of good faith and fair dealing is not a valid basis for a cause of action when it is being used "to override or modify explicit contractual terms."  Id. at 374.  This Court has already explained its view on the clarity of the express language of the Contract provisions at issue.  Accordingly, and finding no evidence that ODEC had unfettered discretion in refusing to grant RBI's requested extension of time or provide the additional payment requested for the removal of non-rippable rock, the Court will grant summary judgment as to Counterclaim VI.

## D.   Counterclaim XI: Estoppel/Detrimental Reliance

In its Brief in Opposition, RBI indicates that it "does not oppose ODEC's Motion for Summary Judgment with respect to Counterclaim XI."  Def.'s Br. Opp'n Pl.'s Mot. Partial Summ. J. 30.  Consequently, and because promissory estoppel is not a valid cause of action in Virginia, summary judgment will be granted as to Counterclaim XI.  See W.J. Schafer Assocs., Inc. v. Cordant, Inc., 254 Va. 514, 493 S.E.2d 512 (1997).

16

## V.   CONCLUSION

For the reasons stated, ODEC's first Motion for Partial Summary Judgment is hereby GRANTED in its entirety.


_____/s/   James R. Spencer_____
CHIEF UNITED STATES DISTRICT JUDGE


ENTERED this _4th_ day of August 2006

17